MAYHEW, Respondent, vs. MAYHEW, Appellant.

*November 4, 1941—January 14, 1942.*

For the appellant there were briefs by *Sheldon & Freytag* of Elkhorn, and oral argument by *William A. Sheldon*. *Adams & Adams* of Beloit were of counsel on the brief on motion for rehearing.

For the respondent there were briefs by *Garrigan, Keithley & O'Neal* of Beloit, and oral argument by *George A. Garrigan* and *Roger D. O'Neal*.

The following opinion was filed December 2, 1941:

MARTIN, J. While defendant has appealed from the whole of the judgment, the errors assigned by him relate only to the custody of the minor child, Elizabeth Ann Mayhew. In his brief appellant states:

"There is one issue upon this appeal upon which appellant requests review."

The issue stated is:

"Whether or not the best interests of the minor child, Elizabeth Ann, require a transfer of her custody from the appellant father to the respondent mother."

The respondent's motion to review that part of the judgment denying her a divorce from the bonds of matrimony raises the question as to the sufficiency of plaintiff's proof in that regard. It is conceded by respondent's counsel that

proof of nonsupport has not been established. No useful purpose will be served by setting forth in detail the evidence upon which the findings are based. It has all been carefully examined and considered.

The parties were married November 7, 1936. Elizabeth Ann was born October 18, 1937. She is the only issue of said marriage. The parties lived in the village of Clinton, Rock county. Prior to their marriage defendant had secured a position at Horicon, Wisconsin, they had rented a house there, and had sent a part of their household goods to that city. The night before the wedding defendant's mother insisted that they abandon their plans and live in the village of Clinton and that defendant continue to work for her on the Clinton Times Observer, a weekly newspaper published by the mother. It was then agreed between the parties and defendant's mother that they should set up a separate home in Clinton as soon as one could be secured. However, following the marriage, they moved into the household of defendant's mother, which at that time consisted of the parties to this action, the defendant's mother, and his two sisters. The members of the household made a division of the housework. Plaintiff was to do the cooking and general housekeeping, and tend the furnace during the day. Shortly thereafter the parties found a house in Clinton suitable to their needs. Defendant's mother objected to their moving from her home to the house they had found, again her objections being for business reasons.

In the spring of 1937 one of defendant's sisters suffered a nervous collapse and the mother decided to take her on a motor trip to Canada. The plaintiff gave the mother-in-law $200, which she borrowed on her life insurance policy, to cover the expenses of the mother's and daughter's trip to Canada. They remained away on this trip until the fall, during which time the parties to this action and one of defendant's sisters constituted the members of the household. It

appears without dispute that during this period plaintiff and defendant led a happy normal life. Soon after the return of the mother and daughter Elizabeth Ann was born. The domestic troubles involved in this action date from that time. It should be said that a considerable part of their troubles resulted from misunderstanding and lack of proper appreciation of the marital status, particularly after the arrival of their child.

There was a considerable difference in the ages of the parties. At the time of their marriage defendant was twenty-two years of age, plaintiff was thirty-one. They were of different temperaments. Upon the birth of Elizabeth Ann, defendant gave orders that plaintiff's mother and her only living sister could not see either plaintiff or her baby for a period of ten days, although the birth was normal and the mother made a normal recovery. However well-intended, this order hurt the plaintiff's feelings.

On another occasion, the evening before plaintiff's mother died, plaintiff and defendant called at the hospital, at which time plaintiff's sister was there. It appears that the doctor told the plaintiff and her sister that their mother was passing away fast and that it would be only a matter of a short time. Plaintiff's sister asked if she could stay at the hospital until their mother passed away. Defendant objected, saying:

"She [plaintiff] has to get home and get breakfast. We can't possibly stay."

Plaintiff cried and replied:

"It is up to Ned [defendant] as it always is."

Plaintiff left the hospital with her husband, the mother died the following morning at 8 o'clock.

Defendant on several occasions told plaintiff that she was mentally incompetent and suggested that she be taken to an institution. On a number of occasions defendant has inter-

fered with the plaintiff's care of their child. Prior to plaintiff's leaving the mother-in-law's home on or about January 28, 1941, defendant's sister and her husband with their two children moved into the home, thus making three families living in the same household. This situation brought about an intolerable condition and caused considerable differences between plaintiff and her husband. It appears that plaintiff on a number of occasions requested her husband to provide for a separate home. On January 28, 1941, some trouble arose concerning the children during which controversy plaintiff's mother-in-law ordered her out of the house. She immediately left and it appears that she verified her complaint in this action on the second day following. The evidence discloses many other details of domestic troubles which we deem unnecessary to relate.

On the single issue raised by defendant on his appeal, namely, whether the best interests of the child require that her custody be left with the mother, as now fixed by the judgment, and since the only contention of the defendant with reference to the mother's custody was her mental fitness to have such custody, it is considered that that issue has been properly determined by the trial court who saw the parties, heard their testimony, and made its decision on the grounds of the best interests of the child. It is clear to us that the trial court had in mind the rule as stated in *Jensen v. Jensen,* 168 Wis. 502, 504, 170 N. W. 735, wherein the court said:

"The welfare of the child is now the controlling consideration; and with regard to children of tender years, especially girls, preference will ordinarily be given to the mother, other things being equal and she not being unfit."

In *Jenkins v. Jenkins,* 173 Wis. 592, 595, 181 N. W. 826, relating to the custody of a male child three years of age, whose custody the trial court had awarded to the father together with the custody of two brothers, five and eight years of age, respectively, on the ground that it was for the best

interests of the children that they should be brought up as one family, the court in reversing the judgment of the trial court as to the custody of the three-year-old child said:

"For a boy of such tender years nothing can be an adequate substitute for mother love—-for that constant ministration required during the period of nurture that only a mother can give because in her alone is duty swallowed up in desire; in her alone is service expressed in terms of love. She alone has the patience and sympathy required to mold and soothe the infant mind in its adjustment to its environment. The difference between fatherhood and motherhood in this respect is fundamental and the law should recognize it unless offset by undesirable traits in the mother."

This rule has been adhered to down to date. See *Acheson v. Acheson,* 235 Wis. 610, 294 N. W. 6; *Elies v. Elies, ante,* p. 60, 300 N. W. 493. The judgment on defendant's appeal as to the custody of the child must be affirmed.

On the plaintiff's motion for review of that part of the judgment denying her a divorce from the bonds of matrimony it is considered that the court erred in holding that the allegations of the complaint with respect to cruel and inhuman treatment of the plaintiff by defendant by means other than personal violence had not been proven to such a degree or extent as to constitute sufficient grounds for a divorce from the bonds of matrimony. The court did find that certain conditions have existed throughout the married life of the parties which have resulted in an unhappy relationship between them; that the situation in the home provided by defendant for plaintiff brought about an unhappy and unhealthy condition therein with respect to plaintiff; that said conditions were provoked by the fault and lack of understanding on the part of the defendant. The court found that plaintiff is of a nervous temperament and that the treatment of the plaintiff by the members of the defendant's household, however well-intentioned, has tended to aggravate rather than alleviate plaintiff's condition. The court further found:

"Therefore it seems entirely fit and proper that the plaintiff, objecting to a continuance of living under such conditions, be permitted to live separately from her husband should she choose to do so."

While the trial court does not specifically mention the fact in its findings, defendant upon his adverse examination admitted that on several occasions he told his wife that she was mentally incompetent and that she should be taken to an institution. Defendant also admitted that he had gone to the county judge for the purpose of having plaintiff examined as to her mental condition; but when told by the judge that he would have to have three signers to a petition for such examination the matter was there dropped.

The occurrence at the hospital the evening before the death of plaintiff's mother, to which reference has been made, was such as would deeply wound the personal feelings of any wife and daughter. Such a wound to a person's feelings is often more lasting than a serious physical wound. The wife was of a different temperament than the husband. He knew that fact at the time of their marriage. He agreed to provide a separate home which the plaintiff insisted upon having, and finally the break came with three families living in the mother-in-law's household. That no house is large enough for two families has been thoroughly demonstrated in this case. We think it clear that the conditions which the trial court said were provoked by the fault and lack of understanding on the part of the defendant were such as to naturally cause plaintiff great mental suffering and impair her health. In *Freeman v. Freeman,* 31 Wis. 235, 249, the court said:

"Everybody knows that there may be a refinement of cruelty practiced on the part of one of the parties toward the other, unconnected with gross and abusive language or epithets or with anything personally violent or threatening, which may render the marriage state absolutely intolerable, and the discharge of the duties of married life an impossibility. Everybody knows that the conduct of the husband to-

ward the wife may be such, even without any personal violence, actual or threatened, as to render her marriage state intolerable, and, from mere mental suffering and physical debility so produced, to make it utterly impossible for her to perform the duties which are expected of a wife, and which otherwise she would be able and anxious to perform."

In *Banks v. Banks,* 162 Wis. 87, 88, 155 N. W. 916, the court said:

"The grievous mental suffering which may be inflicted by one spouse upon the other by means of words and conduct causing wounded feelings may result in the most serious cruel and inhuman treatment and render cohabitation intolerable and unsafe and wholly prevent the discharge of the marital duties by the innocent party." To same effect see *Hiecke v. Hiecke,* 163 Wis. 171, 177, 157 N. W. 747.

It is considered that the evidence in the instant case clearly established cruel and inhuman treatment of the plaintiff by defendant, that the trial court should have so found and granted plaintiff a divorce from the bonds of matrimony. On plaintiff's motion for review, that part of the judgment denying her a divorce from the bonds of matrimony is reversed. Since provision must be made for the support and maintenance of the plaintiff and the minor child of the parties, further proceedings to that end should be had by the trial court.

*By the Court.*—On defendant's appeal that part of the judgment as to the custody of the child is affirmed. On plaintiff's motion to review that part of the judgment denying plaintiff a divorce from the bonds of matrimony the judgment is reversed. Cause remanded with directions to grant plaintiff judgment for an absolute divorce and to fix a suitable allowance for the support and maintenance of the plaintiff and the minor child of the parties.

A motion for a rehearing was denied, without costs, on January 14, 1942.